OPINION OF THE COURT
Larry M. Himelein, J.
INTRODUCTION
This is an action by a materialman to foreclose a mechanic’s lien. The case was tried nonjury on January 20, January 21 and February 9, 1993. Memoranda and reply memoranda have been submitted by both sides and I thank counsel for both a well-tried case and their written materials which were instrumental in clarifying the issues.
Defendant Todd Boardman is a general contractor who agreed to build a home for defendants Gordon and Kathleen Buck. After problems arose, Boardman filed a mechanic’s lien on June 18, 1991 and commenced a foreclosure action on or about August 8, 1991. The Bucks’ answer raised the affirmative defense of willful exaggeration under section 39 of the Lien Law and counterclaimed for the cost of the work they performed themselves or paid for separately.
Plaintiff Regal is a building supply company that sold *378 materials to Boardman for use in constructing the home. After supplying more than $11,000 worth of materials that were not paid for, plaintiff filed a mechanic’s lien against the Buck property on May 30, 1991 and commenced its own foreclosure action on or about September 20, 1991. The Bucks answered and cross-claimed against Boardman.
In October of 1991, Boardman filed a bankruptcy petition and received the usual discharge of unsecured debts. The trustee in bankruptcy did not pursue Boardman’s foreclosure action and apparently all concede that this claim thus reverts to Boardman (1978 Bankruptcy Code [11 USCj § 554). The Bucks’ claims against Boardman were presumably discharged in the bankruptcy.
In July of 1992 (either after Boardman’s discharge in bankruptcy or after Regal obtained relief from the bankruptcy stay), Regal served an amended complaint which added David Jett as another defendant. Jett was a heating and plumbing subcontractor who had also filed a mechanic’s lien on the Buck property; his case was settled prior to trial.
PRELIMINARY LEGAL ISSUES
The Bucks’ answer raised as defenses (1) the lack of privity of contract between themselves and plaintiff; (2) the claim that they have paid in full for the materials; (3) the claim that the mechanic’s lien is invalid because it is exaggerated; and (4) the failure to state a cause of action.
Defendants also cross-claimed against Boardman, claiming (1) Boardman failed to adhere to the agreement between them, thus damaging the Bucks; (2) Boardman breached his agreement with the Bucks by failing to complete the home in a good and workmanlike matter and in fact did not complete the home; and (3) they paid Boardman for all materials he used in the construction and are therefore entitled to a credit from Boardman for all or part of the materials.
Two of the defenses are easily disposed of. The complaint clearly states a cause of action (see generally, Lien Law art 2; Martirano Constr. Corp. v Briar Contr. Corp., 104 AD2d 1028). Further, a materialman or subcontractor is not required to be in contractual privity with the property owner in order to foreclose a mechanic’s lien (Rainbow Elec. Co. v Bloom, 132 AD2d 539; Hartman v Travis, 81 AD2d 692).
At trial, defendants renewed the defenses of exaggeration and full payment. They also alleged that plaintiff changed *379 credit terms with Boardman in the middle of the job to the Bucks’ detriment. Finally, they moved to dismiss on the ground that either Boardman’s lien had lapsed or his action against the Bucks had lapsed, so plaintiffs case must fall since a materialman’s lien is derivative from the contractor’s.
I find the claim that plaintiff changed credit terms with Boardman unconvincing. The Bucks’ argument is that plaintiff was "stupid” to continue to extend credit to Boardman and thus, the innocent homeowner should not suffer for that stupidity. No authority is cited for this contention and my own research has disclosed no cases that hold that a material-man who extends credit to a contractor wisely is entitled to his lien while one who extends credit foolishly (or generously, as the case may be) is not. Moreover, the uncontroverted proof at trial established that the business relationship between plaintiff and Boardman was no different from the relationship plaintiff had with other area contractors.
Before the merits of the case can be reached, defendants’ motion to dismiss must be addressed. Boardman’s foreclosure action against defendants was not pursued by the bankruptcy trustee or by Boardman since his discharge. In this action, which named both Boardman and the Bucks as defendants, Boardman filed a notice of appearance but did not answer or cross-claim. Ergo, contend the Bucks, Boardman’s lien has lapsed and plaintiffs lien, because it derives from Boardman’s, must also fall (see, Lien Law § 44 [5]).
It is well settled that a materialman’s or subcontractor’s lien is derivative in the sense that it is derived from what is owed to the contractor (76 NY Jur 2d, Mechanics’ Liens, § 20; McCreary Co. v People, 267 NY 37). Does Boardman, by not answering plaintiffs complaint, give up his lien and consequently cause Regal to lose its lien? The statute appears to say "no.”
Section 17 of the Lien Law, in part, provides as follows: "If a lienor is made a party defendant in an action to enforce another lien, and the plaintiff or such defendant has filed a notice of the pendency of the action within the time prescribed in this section, the lien of such defendant is thereby continued. Such action shall be deemed an action to enforce the lien of such defendant lienor.” Therefore, according to the statute, Regal, by bringing this action and naming Boardman as a defendant, and timely filing a notice of pendency, has continued Boardman’s lien whether Boardman commenced his *380 own action or not (see also, Tri-City Elec. Co. v People, 96 AD2d 146, affd 63 NY2d 969; Berger Mfg. Co. v City of New York, 206 NY 24; Lien Law § 19 [2]).
Lincoln Natl. Bank v Pierce Co. (228 NY 359) is not to the contrary. Lincoln did not involve an action to foreclose a mortgage or enforce a lien and therefore the action did not "save” the defendant lienor’s lien; neither was Lien Law § 44 (5) implicated. In Lincoln, the defendant lienor did in fact appear, answered, alleged all facts necessary to foreclose its own lien and filed a lis pendens, and was thereby deemed to have commenced an action to foreclose a lien and saved his lien.
Although Boardman’s lien has been preserved by the commencement of this action, that does not end the inquiry. The Bucks urge that Boardman’s failure to answer or cross-claim in this case operates to waive his lien and thus, plaintiff’s derivative lien must also fall.
Resolution of this argument requires analysis of two provisions of the Lien Law. Section 44 (5) of the Lien Law provides that in an action to enforce a lien: "Every defendant who is a lienor shall, by answer in the action, set forth his lien, or he will be deemed to have waived the same, unless the lien is admitted in the complaint, and not contested by another defendant.” Section 17 of the Lien Law, however, provides that "[s]uch action [by a lienor who serves a defendant lienor] shall be deemed an action to enforce the lien of such defendant lienor”. I find it extremely difficult to reconcile those two sections.
Plaintiff contends accurately that Boardman’s lien is admitted in the complaint. However, the lien is clearly contested by the Bucks. In Atlantic Terra Cotta Co. v Rubenfield Constr. Corp. (126 Misc 279), the court construed Lien Law § 17 to relate merely to the time for commencing an action and the necessity of filing a notice of pendency. Thus, where defendant lienors were served and did not answer and their liens were not admitted in the complaint, they were not permitted to recover in an action to foreclose another’s mechanic’s lien (see also, McConologue v Larkins, 32 Misc 166; Hill v Flatbush Consumers’ Ice Co., 143 App Div 559).
In Hardwick v Royal Food Co. (78 Hun 52), Reliance Fed. Sav. & Loan Assn. v Venet (57 AD2d 830) and Matter of Lobbett v Galpin (228 App Div 65), the defendant lienors were held not to have waived their liens by failing to answer. *381 However, all three cases involved mortgage foreclosures rather than actions to enforce mechanics’ liens so Lien Law § 44 was inapplicable. In Kelly Lbr. Co. v Otselic Val. R. R. Co. (136 App Div 147), all the liens were admitted in the complaint and none were challenged. Under those circumstances, the lienors could recover without having to answer.
I have been unable to find any cases that permit a defendant lienor to recover in another party’s mechanic’s lien foreclosure action where the lienor has been served and not answered, notwithstanding the language in Lien Law § 17 that deems such action one to enforce the lien of any defendant lienor who is named as a defendant and served with the complaint.
Berger Mfg. Co. v City of New York (206 NY 24, supra), cited by plaintiff, is not on point. In Berger, the defendant lienors answered and asserted their own liens, which meant they did not then have to commence their own separate actions to foreclose their liens.
Accordingly, it appears, and I conclude, that while Board-man’s lien has been "preserved”, he has waived any right to collect on his lien. The question now becomes whether Board-man’s waiver bars Regal from foreclosing its own lien. Again, I find no cases directly on point but I am compelled to conclude that Boardman’s waiver does not bar Regal from foreclosing its own lien.
A subcontractor or materialman’s lien is restricted to the amount owed to the general contractor by the owner at the time the lien was filed (Central Val. Concrete Corp. v Montgomery Ward & Co., 34 AD2d 860; Strain & Son v Baranello & Sons, 90 AD2d 924; Lien Law § 3). In Central Val. Concrete, the subcontractor but not the general contractor had filed a lien; the fact that the general contractor had not filed did not bar the subcontractor from foreclosing his own lien as long as he could establish that money was in fact owed to the general contractor.
Other cases have zealously enforced the rights of subcontractors and materialmen. For example, it has been held that the invalidity of a subcontractor’s lien does not affect the rights of its own subcontractors (McCreary v People, supra). Further, a contractor cannot deprive a subcontractor of its statutory right to a lien (North Am. Iron Works v DeKimpe, Inc., 232 App Div 579) and a materialman’s lien is valid even if a dishonest contractor uses the materials elsewhere (Giant Portland Cement Co. v State of New York, 232 NY 395).
*382 It thus appears that the Lien Law was intended to protect materialmen and subcontractors as long as something is owed the general contractor whether or not he files a separate lien. Given that the statute is to be construed liberally to effect its purposes (Lien Law §23; Tri-City Co. v People, supra; Giant Portland Cement Co. v State of New York, supra), I conclude that Boardman’s failure to answer cannot invalidate Regal’s lien.
Any other conclusion would be inconsistent with the aims of the statute. For example, a general contractor who failed to file his own lien would thereby defeat the legitimate lien of a subcontractor or materialman, clearly, in my opinion, a result not intended by the statute.
If we understand that the materialman has a claim on the amount due the contractor (see, R.E. Crist, Inc. v LaskerGoldman Corp., 27 Misc 2d 552), it matters not that the contractor does not file his own lien. No different result should obtain if the contractor fails to litigate after filing a lien (see, Griffin, Mechanic’s Lien Law § 12; Annotation, 75 ALR3d 505, 590; Person v Stoll, 72 App Div 141, affd on opn below 174 NY 548; Mack v Colleran, 136 NY 617). What the materialman has a claim on is the fund due the contractor.
Finally, it should be recalled that Boardman did in fact timely commence his own action. Accordingly, the motion to dismiss on the ground that Boardman’s lien has lapsed is denied and we now turn to the merits of the case.
WHAT WAS THE CONTRACT?
There is a clear disagreement on this issue. Both parties agree that the contract price was $180,000; however, plaintiff claims that the price did not include the foundation, excavation, well or septic, while defendants claim the opposite.
I do not find the contract ambiguous. The contract states, "House build [sic] and ready to move in according to print provided for the sum of $180,000” and goes on to say, "House to be started after foundation is ready.” I do not see how any reasonable person could read that and conclude anything but that the price did not include excavation and the foundation. Moreover, the prints contain very little information about the foundation and nothing about the excavation, well or septic and I conclude that the well and septic were not intended to be part of the contract price either. Since I conclude that the *383 contract was unambiguous, there is no reason to consider the peripheral evidence preferred on this issue.
Were I to find the contract ambiguous and consider the extrinsic evidence on the issue of what the parties intended, I would come to the same conclusion. Boardman’s first proposal to the Bucks provided a square foot cost for each floor of the house but made absolutely no mention of the excavation, foundation, well or septic, except to note that the house would be "started after foundation is ready.” Further, the Bucks dealt directly with the contractors who did the excavation and foundation work and paid those contractors themselves. It is clearly unreasonable to believe that Boardman would include in his estimate items over which he had no control or knowledge and which were negotiated by the Bucks before Board-man even began his work.
Similarly, the Bucks negotiated with the well and septic contractors. Again, it is unrealistic to believe that Boardman’s estimate included future work over which he had no control or knowledge. Boardman’s only involvement with the water and septic contractors was to pay some invoices at Mr. Buck’s request because of what Buck said were cash flow problems at the time. I specifically credit Boardman’s testimony on this point and do not credit the Bucks’. Significantly, Mrs. Buck denied any conversation of that nature between her husband and Boardman but at an examination before trial, Mr. Buck acknowledged having that conversation. Moreover, the fact that the Bucks thought they had sold their house only to have the sale fall through is logically supportive of Boardman’s testimony that Mr. Buck told him they were experiencing cash flow problems.
The Bucks point to the construction cost analysis as supportive of their position that the $180,000 included all the items discussed above. Boardman testified that after construction had begun, Mr. Buck brought him this document, already partially filled out, and told him that the figures must total $180,000 for its presentation to the bank to help with their loan. Boardman said he signed the document although he was reluctant to do so. Again, I credit Boardman’s testimony on this issue. I do not believe this document was intended in any way, shape or form to modify the contract and Boardman could not possibly know what the negotiations were between the Bucks and these other subcontractors.
However, I also conclude that the $180,000 price was a *384 "turn key” price except for the items noted above. I do not doubt that there was discussion between Boardman and the Bucks about Mr. Buck doing some of the work. Nonetheless, the contract is specific in stating "House build [sic] and ready to move in” (emphasis supplied). If Boardman, as the drafter, claims the contract means something other than what it says, the language must be construed most strongly against him (22 NY Jur 2d, Contracts, § 228, at 76).
I note here that neither Boardman nor either of the Bucks was particularly direct in answering questions put to them. Several times I was compelled to admonish them to simply answer the questions. Nonetheless, I believe that Boardman testified truthfully to his best recollection of the events; I am not as convinced of that where the Bucks are concerned. Both Bucks were hostile to the other parties and at times evasive, and I am concerned that this evident hostility may have infected their testimony. On at least one occasion, when Mr. Buck claimed the electrical contractor was paid more than the estimate, I thought he was deliberately trying to misrepresent the facts.
is boardman’s lien willfully exaggerated?
Lien Law § 39 provides that a mechanic’s lien that is willfully exaggerated is void. However, an honest mistake as to the amount owed is not a willful exaggeration and does not void a lien (Goodman v Del-Sa-Co Foods, 15 NY2d 191; E-J Elec. Installation Co. v Miller & Raved, 51 AD2d 264).
Moreover, even a significant difference between the amount claimed and the amount determined to be owed does not require a finding of willful exaggeration. For example, in American Constr. Corp. v Finlay (200 NYS2d 993), the lienor honestly believed he was owed $36,990 but was only entitled to $13,800. Nonetheless, the lien was not voided for willful exaggeration (see also, Clemente Constr. Corp. v Cox Contr. Co., 172 Misc 904; Jones Constr. Co. v Parklaw Realty, 76 AD2d 1018, affd 53 NY2d 718; Goebbel v Gross, 153 Misc 637).
Notwithstanding the disagreement here, I find no willful exaggeration of the amount due Boardman; any difference between the lien and what he is owed, if anything, is attributable in my opinion to honest differences of opinion. Furthermore, for reasons discussed previously, it is doubtful that even a willful exaggeration on the contractor’s part would invalidate the lien of a materialman.
*385 WHAT, IF ANYTHING, IS OWED TO BOARDMAN?
Initially, I find very little proof that Boardman "walked off the job”. There were clearly problems and defendants did not dispute that they made clear to Boardman they were not going to pay him any more. Under the circumstances, any failure to complete on Boardman’s part was justified (see, Westchester Asbestos Co. v Freyn Bros., 252 App Div 787; North Am. Iron Works v DeKimpe, Inc., supra; 76 NY Jur 2d, Mechanics’ Liens, § 176). I also find no proof of poor workmanship since even defendant’s expert testified to the high quality of the construction.
We begin with the contract price of $180,000. I credit Boardman’s testimony concerning the extras or change orders and the payments he advanced to the well and septic contractors. Thus, to the $180,000, we add $10,691.67 in extras or change orders, $2,385 paid to Caster Well and $4,550 paid to R & E Johnson, for a total of $197,626.67. From that we deduct $1,703 for installing the tile and hardwood floors since, construing the contract against Boardman, these items were included in the total price. Also deducted is $3,700 for the gutter, front slab, porch railings and exterior stain, $1,824.79 in Buck purchases approved by Boardman, $6,000 for interior painting ($400 for the stain was included in the $3,700) and $2,000 for the uncompleted deck, leaving a total due Board-man of $182,898.88. Since Boardman was paid $154,500, he is owed $27,898.88.
I find the claim that the Bucks should be credited with $2,000 for installing the insulation to be highly speculative. Further, any money spent by the Bucks to complete the house was nominal and more than offset by over-credits they received from Boardman.
I emphasize that the difference between this figure and the amount of Boardman’s lien of $37,601.88 is not the result of willful exaggeration on Boardman’s part but an honest disagreement over what he believes he is owed. Moreover, as indicated earlier, I believe the parties discussed the Bucks performing some of the work but the law requires an ambiguity to be construed against the party that drew the contract, in this case Boardman.
If I were to make these calculations on the basis of quantum meruit, I would find a greater amount owed to Boardman. John Avery, a project manager for Mayshark Builders, reviewed the drawings, inspected the home and testified that the *386 house would cost $239,000 to build. Avery has estimated 45 to 50 homes in the last few years and came to court with a detailed, 10-page itemized list of costs to support his opinion. I found his testimony compelling and believable.
Lance Spicer, a real estate broker and licensed appraiser, testified that the house would cost $147,283 to build and had a fair market value of $128,500. He believed Avery’s figures were "high”. Spicer, however, has no background in building or estimating and based his opinion on a book by Marshall and Swift. He estimated the fireplace in the Buck home to cost $4,006 when it had actually cost $6,400, an error of more than 37%. Accordingly I found his testimony, albeit honestly given, much less convincing on this issue.
CONCLUSION
Since plaintiffs lien is less than the amount due the general contractor, plaintiff is entitled to the full amount of its lien, $11,233.07 plus costs (but not counsel fees) and interest from May 30, 1991, the date its lien was filed.
Boardman would appear to be entitled to the amount of his lien, as reduced by the court, less plaintiffs recovery, which I believe was included in Boardman’s lien. It would seem that figure would then be reduced by the amount paid to David Jett prior to trial although there is no proof on that issue. However, as noted earlier, the cases seem to bar Boardman’s recovery by reason of his failure to answer or cross-claim in this case.
There is another reason why this court is disinclined to grant an award to Boardman. After his lien was filed, Board-man filed a bankruptcy petition and has since been discharged. While his efforts to repay some discharged debts are certainly commendable, he has no legal obligation to do so. Since this is an action founded in equity, it would seem unjust to permit Boardman to recover on a claim at the same time he obtained a discharge of his own debts. While this decision appears to unjustly enrich the Bucks in the amount of approximately $16,000, that result seems to me less inequitable than the alternative. Accordingly, no recovery is awarded to Board-man and his lien is discharged.